Good morning, Your Honors. May it please the Court, my name is Luke Besby. I'm dearing for plaintiff's atonement. I'm Jerry Stever. I'd like to reserve five minutes of my time for rebuttal to the Court of General Honor. Thank you, Your Honor. The issue appeals whether the District Court erred by granting US Bank's motion for summary judgment against Mr. Stever by finding that Stever failed to present the prima facie case for age discrimination under the Age Discrimination and Employment Act. The very recent France v. Johnson decision was issued finally during the briefing scheduled for this case. Judge Gould offered a very clear opinion as to the standards that a District Court should apply when addressing a motion for summary judgment in an age discrimination case. And I'd like to run through some of the facts that were presented to the District Court  Did you show a 28-J letter? Did you send a 28-J letter with it? I'm sorry, Your Honor? A 28-J letter. Did you say that that decision was decided subsequent to the briefing? It was decided during the briefing schedule, finally. I think the initial opinion in the France v. Johnson decision was issued in August, and then it was subject to rehearing and finally a remand. The final decision came out, it's what you're saying, on October 14, 2015, which was kind of in the middle of the briefing schedule in this case. And so did you refer to it in your briefing? I'm just trying to know. I referred to it in my briefing. Now, if you take a look at what Stever presented to the District Court, it's, we claim it's both direct and circumstantial evidence of age discrimination. Stever alleges that his boss refers to him as he, quote, old dog in the context of a conversation about Stever's difficulties with his computer and the difficulties Stever was having doing his job with the administrative system which he previously had at U.S. Bank. Now, the France v. Johnson decision says very clearly that when a plaintiff opposing summary judgment presents direct evidence of a determinatory motive, courts do not assess the direct evidence in the term-shifting framework. Now, we think this evidence alone is enough to overcome summary judgments in this case, but that's about enough. I think France overruled our jurisprudence. That's a great remark. It's a great remark to finish it. Indeed, Your Honor, and we excude the District Court's conclusion that it was a super remark. If you examine Stever's statement, he made it in the context of a conversation that he and his employer had right after his new boss came on the job, and he says, by talking, you know, the fact that I didn't have a computer that worked, talking about the fact that the last time I was doing the computer work myself, it was on the old software, the old programs, not the new, that I was told, and I'm paraphrasing, I'm not quoting correctly, that we old dogs had to learn new tricks. Now, what's that got to do with me being an old dog? Question mark. I mean, if I need to come up to speed on that computer, why not provide me with some training on the new programs and new systems? Question mark. Which I never got any, and they didn't ask for it, and that's an excerpt from Record 64, which is the deposition of my client, Jerry Stever. Right. That's the only comment you have on the record. Right. It is the only comment from U.S. Bank that is direct evidence of age discrimination in Congress. We do also, we did present in our briefs with the district court, circumstantial evidence of age discrimination, namely the fact that Stever was treated differently from these two similarly situated financial advisors who were 10 years younger than he was during the time period. Number one, my client was not provided with an administrative assistant, where a particularly situated financial advisor who worked in the same territory was. Mr. Weichel. It is her. Yes. And he was 58. It was her. And he received an assistant, though, because his combined revenue production was over $1 million, and I think the other reason was that it was part of his contract when he came on board and it was negotiated. It seems like those are two distinguishing factors. It's all just, how are they supported situated? Those two factors are present. Question. And I did ask Mr. Schuster about this very question at his deposition, which was in James in the excerpt from 383, and I said, was Mr. Weichel provided with an administrative assistant when he was hired? Yes, he was. Did Mr. Weichel produce over $1 million in revenue for new U.S. banks? The answer was no, he wasn't. Well, that was the proper explanation that Mr. Schuster gave for not providing my client with an administrative assistant. And then Schuster went on to explain that he can combine the revenue of different advisors and have them share administrative assistants, and I think it starts with his discretion to do that. Now, I asked why wasn't my client provided with an administrative assistant when he took lead, and he basically didn't have an explanation for why that was the case. And in terms of somebody situated, which we have to look at, I think your client's revenue was much lower, was it not? Well, actually, in excerpt from 383, it was lower than $1 million. It was lower than $1 million. It was lower than $1 million. I mean, I think the most was quite $5,000. I think Mr. Schuster's actual historical revenue was over $400,000. And if you look at the excerpt from 383, page 21, at line 14, Mr. Schuster stated that I recruited him from Wells Fargo, and his mom was in the neighborhood of $350,000 in revenue, and Bill was somewhere around $350,000 to $400,000. So it's not, you know, it's not that far off. Mr. Stieffer could have been provided an administrative assistant. He could have shared the administrative assistant, but there's various age discrimination, and the answers, though, were in the same projected class, which showed that people outside the class who recruited him were favorable. Well, Mr. Stieffer testified that it's his belief that Mr. Weicholz actually had to replace him. And there's no doubt that, for instance, he was 15 and Mr. Hawley was the other person, and it's all at the same age stage as Mr. Stieffer. So I think that creates that could be evidence to show that Mr. Schuster was not a motivated by age discrimination in this case, but I think it needs to be weighed against the direct evidence that Mr. Stieffer produced, including his statement in his affidavit, New Service Record 395, in which he states that Mr. Ron Weicholz was hired to replace me in U.S. Bank as Mr. Weicholz assigned many of my branches and clients before I was hired. And there's also the fact that Weicholz was provided with an And there's also the issue of managed accounts. Did Mr. Stieffer address this issue? With respect to the goal, and I was confusing goal with the thing I found earlier with the combined revenue production. But with respect to that goal, it's the explanation here, at least for the record, I thought was that Mr. Weicholz received a lower revenue production goal because the revenue production goals are partially based on seniority. Is that right? I think that is the case, Your Honor. But considering the number of branches that Mr. Stieffer had and Mr. Ochi had, which were smaller, and the expectations for revenue production, that a jury could interpret that information as evidence that the action plan provided to Mr. Stieffer was essentially a trap door, which the early client was going to be able to meet it, frankly. And I also thought that the revenue production goal was not part of the senior reasons for termination. It was not, Your Honor. Our argument is that he was terminated despite having met the primary central goal under the action plan, which was to generate significant revenue. My client received this action plan, and he knew he was in for the gun. And so he worked very hard to increase his production to prove that he was still capable of doing this job. He, granted, failed to meet some of the other requirements of the action plan, such as the votes with Mr. Weicholz, which is now reverberated in the Ombudsman's department very often. In terms of difference with Mr. Weicholz, the situation with Stieffer, I thought the policy of the company was that if you raised over, or generated a combined revenue production over a million, then you did get an assistant. And Mr. Stieffer was short of a million, wasn't he, Your Honor? He was, Your Honor. But my argument is, as long as Mr. Weicholz, because I thought his combined revenue production was over a million. Oh, that's, Your Honor, they're saying that that combined revenue, which made him eligible for an administrative assistant, is combined with another financial advisor. So it's really two people who are qualifying for the million dollars. And was that part of the negotiated deal when they got him? Mr. Schuster testified that that was part of the deal he made with Mr. Weicholz and Mr. Love when they were hired. Because together they had over a million dollars in revenue, he would provide them with an administrative assistant who would take the chair to perform their work. And, Your Honors, for clarity, at EOR 48 it indicates that my client's total revenue plan for 2011 was 431,881. So I may have left that in the key first. I'm going to turn it over. Thank you. Good morning, Your Honors. Sandra Ketter on behalf of the appellees. I would like to first address Mr. Busby's reference to the France v. Johnson case. In that case the court concluded that when there is a stray remark coupled with some additional evidence, the correct and most appropriate standard is to follow the McDonnell-Douglas framework, and that is indeed what the district court did in this case. The district court concluded, correctly concluded, that Mr. Stever failed to present a prima facie case of age discrimination. Out of the four elements of a prima facie case, Mr. Stever satisfied two. He is indeed an individual over the age of 40. He is 68 years old, and he indeed was terminated. However, Mr. Stever failed to present sufficient evidence to tie those two facts together. The undisputed facts indicate that Mr. Stever was not treated any differently. They were similarly situated individuals, and that is what the district court relied upon in concluding a summary judgment was warranted in favor of appellees. It's undisputed that Mr. Stever was notified in 2000, at the end of 2010, that USAI was going to be rolling out new technology tools and that all financial advisors were going to be required to use those tools. In fact, in Mr. Stever's 2010 performance evaluation, it mentions the need for Mr. Stever to master these tools and ties his success in the year 2011 to the use of these tools because it was supposed to make financial advisors more efficient. It's undisputed that Mr. Stever's assistant, who he shared with a younger employee, Mike Hayoshi, resigned at the end of 2010. It's undisputed that Mr. Stever's prior supervisor, David Turrell, who Mr. Stever claims was the discriminatory actor, it's Mr. Turrell who decided not to replace that administrative assistant because Mr. Stever's production did not warrant an assistant for he and a younger employee, Mr. Hayoshi. Why did the other two get the assistants? Mr. Weichel and Mr. Love, I believe it was. Yes. And these two didn't get an assistant. Mr. Weichel and Mr. Love were given an assistant because when Mr. Schuster took over this territory in the spring of 2011, Mr. Schuster was required and tasked with generating more revenue for more production. So Mr. Schuster went out and hired more financial assistants, financial advisors. Mr. Weichel and Mr. Love came over from Wells Fargo, where they had an administrative assistant, and the combined generation, production generation, of Mr. Love and Mr. Weichel exceeded a million dollars. So, therefore, Mr. Schuster, according to the standard policy of USBI, was able to authorize the assistant to Mr. Weichel, age 58, and Mr. Love, age 68. The fact that Mr. Schuster hired Mr. Love in August of 2011, he didn't start until September of 2011, but he hired Mr. Love in August of 2011, three months before he terminated Mr. Stever, indicates an inference of age discrimination because Mr. Love and Mr. Stever were exactly the same age. Mr. Love and Mr. Weichel were given an administrative assistant. Mr. Love was required to use and acquire the same technology tools as Mr. Stever. There's simply no evidence that USBI treated younger employees any differently. All of the allegations that Mr. Stever is making to point to age discrimination are just simply not supported by the record. And then could Mr. Stever have been combined, and apparently his generated combined number was 412,000-plus. Could he have been combined with Mr. Ryoshi or anybody else to get an assistant? Mr. Ryoshi and Mr. Stever combined did not meet or exceed the $1 million production. It is also supported by the record that Lyndon Denton was asked by Mr. Schuster whether or not she wanted to help Mr. Stever out as needed, and she declined because she did not believe that the way that Mr. Stever presented financial investments was appropriate. So, how about Mr. Ryoshi? He overrode the production call. That's the other main claim that they're making. Mr. Ryoshi was employed. He was hired four years after Mr. Stever. Mr. Stever testified during his opposition that an annual production goal of a financial advisor is pretty much a formula, you know, that anybody can figure out. It's pretty much 10% over what you did last year. So, Mr. Stever was indeed a higher production generator than Mr. Kawashi. Mr. Stever was employed for four more years than Mr. Kawashi. So, as a result, Mr. Stever was going to have a higher revenue production goal than Mr. Kawashi. Nevertheless, Mr. Schuster did place Mr. Kawashi on an action plan only a few months after Mr. Stever was terminated, and Mr. Schuster eventually terminated Mr. Kawashi for not satisfying the terms of those action plans. So, even though Mr. Stever compares himself to Mr. Kawashi, an individual 10 years younger than him, both of them were ultimately terminated by the same actor. Let's say he survives the primary examination. Would you proceed with the test of the McDonald? Yes, Your Honor. The district court did say that even though it could have stopped the analysis because Mr. Stever did not present a pre-decaution case, the district court nevertheless went on and concluded that the record supports U.S.B.I. having non-discriminatory reasons for terminating Mr. Stever. And some of the examples in the record are that Mr. Stever failed to respond to a single email from his supervisor, Mr. Schuster. Now, Mr. Stever claimed that his computer was on the front. However, he admitted in his deposition that as of November 1, 2011, his computer was working. He got a new computer and it was working fine. Nevertheless, he did not respond to any of those emails that he saw in his inbox from Mr. Schuster, even though Mr. Schuster's email saying, please respond to this, please respond to all so that I know you received it. And Mr. Schuster, we know for a fact that Mr. Schuster was able to get on Mr. Stever's computer at some point and respond to one of his own emails. And it went through because Mr. Schuster received the response from Mr. Stever's email from his computer. It's also understand that Mr. Stever failed to use the USBI technology tools that he was told back in his 2010 performance review that he had to use. He admitted to never using onboarding and never using wealth station. So this is an individual for an 11-month period of time, failed and refused to use these tools. And he was told over and over and over again by his supervisor and by other company officials that he was supposed to use these tools. It was very important to the company, to you, to have these financial advisors using these tools. I guess the only question I have is, I mean, you outlined a number in your briefing in here today of issues that were the basis, apparently, for the termination of Mr. Stever. But it appears that weeks before his termination, USBI rated Mr. Stever as acceptable. In all categories, it's stated that he meets expectations in both the trade records and required books and records, two of the areas from which he was fired. And another report showed that Mr. Stever was satisfied. His revenue production goals for the two months following the action plan. And I'm just wondering, in light of these reports, goodness, is that a successful argument for pretext? Your Honor, it's not an argument. The race review is a compliance review. It is not an overall performance review. It is simply a snapshot of somebody going into the financial advisor's office and saying, okay, do you have all of your I's dotted and your T's crossed? It's a performance evaluation, isn't it? No, Your Honor, it is a compliance check. It is a compliance evaluation. It is different than the annual performance evaluation that is conducted by the region manager. What did the performance evaluation say? Was it part of the record? There was no 2011 performance evaluation conducted because Mr. Stever was terminated before that time. He was terminated in November of 2011, and the performance evaluations were conducted at the end of the year. His most recent performance evaluation was December of 2010. It was conducted by David Turrell. It specifically said that he needed to get on board and learn to use these tools. Did it say means and expectations acceptable or not? It said means and expectations, Your Honor, yes. However, thereafter, his administrative assistant resigned. He was not given another administrative assistant because of his reduction by Mr. Turrell, the previous supervisor. And you're saying that these evaluations that occurred the weeks before he was terminated were not performance? I just want to understand what they were. You're right. It is a compliance investigation. I'm sorry, a compliance review. It is somebody that goes into the office and says, let me see your files over there. Do you have all of the correct signatures there? Let me see that you can pull up such-and-such on your computer and find the code of ethics. It said acceptable or means and expectations? It said acceptable. However, there was one significant piece of it that required immediate action, and that resulted in the issuance of a letter of caution to Mr. Stepher. In November, the race review was conducted on October 20th of 2011. And after that, there was a piece of paper that was found that did not have a signature on it, an annuity. So immediately following that, Mr. Stepher, a letter of caution was prepared by compliance and issued to Mr. Stepher on November 17th of 2011. And this is after Mr. Stepher was initially notified that he was going to be terminated. However, Mr. Stepher, a few hours after he was notified of his termination, complained of age discrimination, at which point USBI put a hold on the termination proceeding and decided to investigate the allegations. The investigation concluded that there was no evidence of age discrimination. However, during the time the company was investigating it, the company nevertheless had to continue with further disciplinary action, including the issuance of the letter of caution, because Mr. Stepher did not have that annuity paperwork completed. I gather which your argument is, is that the compliance review in and of itself is not a performance review, but on the other hand, it can form part of a performance review if found noncompliant. Absolutely, Your Honor, yes. There is no evidence in this case of pretext. Mr. Stepher did not present any evidence to show that USBI's stated reasons for his termination are not worthy of belief. There is no evidence that he was terminated because of his age. Indeed, Bill Love, who was the same age as Mr. Stepher, was hired only a few months prior to Mr. Stepher. Mr. Love received a portion of the branches that were split from Mr. Stepher to Mr. Weichel and Mr. Love. Mr. Stepher did testify that the 28 branches that he was handling were too much, and he also testified that the reduction of the number of branches would be beneficial to him and he would be able to learn the tools and he would be able to spend more time with his clients. So Mr. Stepher admitted during his deposition that the reduction of branches to Mr. Love and Mr. Weichel was supposed to actually benefit him in the long run. Unfortunately, he did not satisfy three out of the four pieces of the actual plan. He did not submit a single financial plan. He did not submit a single activity report, even though he stated that he created these manually and he could have submitted them manually to Mr. Schuster, but he didn't. And even though he was told in August of 2011 that he had to attend these twice-a-month regional conference calls, he attended only two of them. Mr. Stepher simply did not take any effort to satisfy the requirements of the plan and the instructions given to him by his supervisor to approve. Thank you. Thank you. Thank you. I'm pleased to be part of this. I just need to address very briefly a few of the points raised by Ms. Smith and her colleagues. You know, if you could touch stage three, I thought we'd talk about which of us has evidence of pretext. My best evidence of pretext is that Mr. Schuster's own statements showed his motivation for firing Mr. Stepher. He called him an old dog and they talked to him through a conversation about his different assistant and his use of the computer. Those bases are basically why he got fired at the end of the day, and that's number one. And number two, indirectly, through an explanation that he was assistant. So he hired Mr. Whitehall and Mr. Long. I think, well, Long wanted to take L-168. Indeed, Your Honor. And I think that's evidence that inspires us in a way in determining whether or not, in light of the other evidence presented by Steve Roth's age determination in his particular case, whether it is credence. And we don't think that U.S.B.S. Crawford's explanation is worthy of credence because it's entirely inconsistent. It's otherwise not believable. My client had a history, demonstrated a history in the record of superior performance in his job. And those are in the record in U.R. 398. That's his performance evaluations in 2007. He got a rating of three, which is a solid performance. He didn't make inconsistent details, which was those expectations, and at times exceeds them. In U.R. 401, this is for 2009, he got a rating of two, which is highly effective, meaning he consistently exceeds expectations in most areas of surpassing performance objectives. And for 2010, the last one that we had, which wasn't disclosed, he got a two, which means he's highly effective, consistently exceeding expectations. Now, a lot of issues were raised by U.S.B.I. about compliance. Okay, well, if that's the case, then why did Mr. Goodhue say complete? This FINRA investment advisor licensed a regulatory control out evaluation, which indicates that he was not having any problems here. Okay, under a rating system, they say, under acceptable indications, a representative and or branch demonstrated an adherence to branch policies and procedures when those new issues noted. Those issues were addressed at the time of the accident or could be a result of a timely manner. Okay, that's inconsistent with the other documents, evidence. Most of it, or some of it, at least, was gathered after. So Steve was told he was fired by his receiver, saying that he was an absorbable employee who failed to comply with policies. You know, we think the jury should weigh whether failures or responding to e-mails. He was the only fatiguing factor for firing, instead of his age, in light of his superior performance history, his compliance with the main component of the action plan, which was he really got to work and started producing a large amount of revenue for U.S. Bank after essentially being put on notice that his job was at stake. Therefore, if you can get this evidence in the light, it would be most favorable to Mr. Stiefert. And you draw all reasonable inferences in his favor. One of the rules for those is a summary judgment. He presented sufficient evidence to show that, which is a hard thing to do, and the person who was fired, I mean, in his mind, age was the factor that made the difference. That's based on what he said. It's based on how he treated mortally situated people differently in the managed accounts issue, which we think is significant. In my client's declaration, or after David, at ER 395, he explained, you know, he had a conversation with Schuster, and Schuster said the bank is moving towards managed accounts, and he said, I don't want to do managed accounts. I don't have the license for it, and it doesn't make sense for my clients. And I'm told, with everything I get to commission, it's the case because I'm going to retire soon. And so, with that, I'll turn this over to the case here. Thank you, Justice. Thank you. The cases are going to be submitted for decision. Thank you both very much today, and we'll be in recess until morning.
judges: Fernandez, Thomas, Murguia